Good morning, ladies and gentlemen. Our first case for argument this morning is Joliet v. Mid-City National Bank. Ted Slaff. Good morning, Your Honors. I'm Theodore Ted Slaff, and I'm counsel for the defendant's appellants in this matter. We're here to review the process, the analysis, and some of the evidence by which this condemnation case was tried and decided. This is not an ordinary condemnation case. It was preceded by six months by a civil rights and federal housing action challenging certain conduct by the City of Joliet, and it was defended by allegations of violations of those statutes. I say this is simply, not simply a challenge to Joliet's basic condemnation authority or action by which municipalities have broad authority to condemn for numerous public purposes, but rather this case is a test of how actual results or effects and potentially discriminatory intentions will be evaluated in a context charging racial discrimination. Here the trial judge chose to evaluate those claims by denying defendants a jury trial on their civil rights and federal housing act claims by excluding evidence of the sort I must say, counsel, that I'm a little perplexed by that, since the judge doesn't purport to have resolved the Fair Housing Act claim. That appears to be still pending. Your arguments about a jury trial on a claim that hasn't been resolved at all seem rather premature. It might be, Your Honor. It would be, Your Honor, if it were not for the fact that the trial judge stated in his order and his opinion, which were appealing, that his findings in the condemnation case would be given preclusive effect. You can state that all you want, but the only thing you can appeal from is the judgment. And the judgment covers only the condemnation case. If in the future the district judge says, I'm going to dismiss the fair housing case based on my findings in the condemnation case, you'll then have an appealable order. But you don't have an appealable order now. All we have is the condemnation case. Very well, Your Honor. In the interest of making sure that we didn't overlook any issue that should be appealed, we raise that here at this time, as I said, principally and precisely because the judge went out of his way to say that, to find that his findings would be given preclusive effect in the other case. But in addition to that jury trial issue, the trial judge here resolved this case by that this court and others have held as the type of evidence that can betray and reveal discriminatory intent, evidence that is at best elusive but nevertheless real. And finally, and significantly, the trial court relied on a settlement agreement with HUD to resolve significant and determinative factual issues. Each of these errors is wholly apart from the trial judge's error we submit of either as a result of them or otherwise, ignoring compelling and uncontroverted statistical evidence of disparate impact, deciding public purpose on the basis of stale, controverted, and selective evidence of so-called blight, and wholly failing to consider a less discriminatory alternative, especially one that says leave evergreen terrorists alone. Make no mistake, this case is about racial discrimination, not simply about blight or the condemnation of property. It's about the effect the condemnation of a 356-unit apartment complex will have on thousands of African-Americans in Joliet now and in the future, the deprivation of the appellant's constitutional right to a jury trial, and the process by which it was decided. Let me ask you. Oh, I just wanted to ask about the HUD settlement because your argument really relies on the vouchers or that the tenants with vouchers won't be able to find places to live, but isn't that speculative? Everything in the HUD settlement is speculative. They're mere promises. They're not commitments. No, in terms of your making the assumption that they're not going to fulfill the terms of the settlement because there have been provisions for people who, for example, get a voucher, go out, can't find housing, right? Yes. And also renovation of a certain portion of the properties. That's part of the settlement. I'd put it this way. It is speculative, perhaps in both regards. However, in this instance, there was evidence of the absence of alternative housing. There was evidence of unavailability of units to be rented with vouchers. That was in the record. What we submit was wrong was when the trial judge, after 100 days of trial, simply used the HUD settlement and its promises to rebut the actual evidence that there was a shortage of housing, that vouchers would do no good. That's the point. And by doing so, he avoided recognizing a prima facie finding of disparate impact and stopped his FHA analysis right there. He didn't go on to address the other points that Arlington Heights, as well as inclusive communities, say need to be addressed, including that of a less discriminatory alternative. He just stopped the FHA analysis. And that is what we submit was wrong. So you don't think you should have taken into account at all the settlement or considered that as evidence of what Joliet plans to do? It can be given weight, but as we pointed out, it was brought in over objection at the very end of this trial where the defendants had no opportunity to cross-examine, to effectively probe its significance. Under that agreement, Joliet received substantial money released from HUD, and we submit that even that agreement itself, in effect, concedes that there's a need for many of these units to remain. If 115, why not the totality of them? But our point is that once this document was received and reviewed and admitted by the court, he just latched onto it to avoid doing the balance of the Federal Housing Act analysis. I guess I would add here, and it may be that by admitting that document and by subsequently dismissing HUD with prejudice from this matter, in fact, the trial court at that stage divested itself of the last vested jurisdiction that even had to try this case. It's not obvious where the jurisdiction lie once HUD was dismissed. As this court previously recognized, when the case was initially removed, HUD was not in it at the time of removal, but was subsequently added. And this court recognized that the presence of HUD in the case was the only basis for removal of the case. I respectfully submit that there is a serious question as to whether the trial court, after it dismissed HUD with prejudice, retained jurisdiction. What is the ground for that? The normal rule is that federal jurisdiction depends on the state of things on the date of removal, or equivalently, on the date the complaint was filed. What doctrine are you relying on for the proposition that if the removing party is dismissed, a case must be remanded? There's no statute that says that. Is there some Supreme Court decision requiring that? The cases that the trial court relied on, the Pacific Mutual I'm not asking what cases the trial court relied on. I'm asking what case you rely on for the proposition that if a removing defendant is dismissed, a case must be remanded. I am noting that the absence of jurisdiction can be created after a case is filed. You're asserting this. Yes, I am. So presumably you have some statute or some case law to support that assertion. I don't think there's any statute that supports it. So what cases are you relying on? There is a doctrine of supplemental jurisdiction. This does not, which the court relied on, this does not fall into that category. And that still requires that there be original jurisdiction. Supplemental jurisdiction, 28 U.S.C. 1367C, says that a district judge may remand a case after the federal question has been resolved. It is not obligatory. You're questioning the existence of subject matter jurisdiction, and I'm trying to figure out what the basis for that is. It's not 1367C. I would refer simply to the absence of that predicate by which jurisdiction exists, the basic rule. So you're relying on no statute and no case law just off the top of our heads? That's not a very good way to deal with subject matter jurisdiction. Well, Your Honor, HUD was out of the case. It's not clear to me, and I would be remiss if I didn't raise it, where jurisdiction lies once it was dismissed. And what's wrong with the principle that jurisdiction depends on the state of things on the date of removal or the date of filing? That's the black letter doctrine, that what happens later doesn't change jurisdiction. That's black letter law. Why is that not controlling here? Well, Your Honor, I am familiar with 1983 cases, which were before trial courts in this district, and once the 1983 action was resolved were remanded for lack of jurisdiction. I suppose I'd rely on Judge Shader's order in a case entitled Huffman against Tavern on Rush for that principle. More than 780 residents at Evergreen Terrace call it home, and more than 90% of these residents have been African-American. The impact of this case is on them. Let me just ask you this. Are you saying that a city can never tear down a public housing project no matter how blighted because rehabilitating that project will always be a less discriminatory alternative? Again, it depends on the analysis of what considerations might outweigh blight. In this situation, the trial court simply didn't make that analysis. But the district court did reject your proposed less discriminatory alternative by finding that millions of dollars and nine years of renovations failed to eradicate the blight, right? That was the district court's finding, and I'd submit that with respect to blight, we might look at what the evidence was of blight and what the public interest that Joliet was asserting. Joliet and the district court would heavily believe that this is a straightforward condemnation involving property that is allegedly blighted and uninhabitable. And if this were simply a case that was not met with challenges, that other motives were involved and other impacts were involved, that would be the end of the case. But blight is only one consideration in the FHA analysis. When you read the district court's opinion, almost the entirety of the text concerns blight in the context of Illinois condemnation law. Effectively, the district court rendered the FHA meaningless, similar to the Second Circuit's decision in Huntington. Counsel, I'm lost. How has the FHA been rendered meaningless when the FHA claim remains pending? You can win on the FHA claim still. And if we win on that, and unless this action is stayed or reversed. No, we decided long ago that the condemnation action would be resolved first. Now, you may disagree with our decision from back in 2007 that the condemnation action must be resolved first. But that's water under the bridge. The point I'm making is that this is not the FHA case. That's still pending. And we submit that this court needs to address this case in order to permit there to be, in order to stop the FHA case from becoming totally moot. If this case goes on through judgment and enforcement and the property is condemned and eradicated, what effective relief can there be in the FHA case? Are you unable to think of relief in the FHA case? Damages? Orders to build new housing? Those are two simple remedies in the FHA case. Very well, Your Honor. And certainly another remedy would just simply be to leave it alone. In the Second Circuit's Huntington case, the court, the district court there, too, gave undue, we submit, undue weight to blight in its FHA analysis. And we'd also refer you to Mount Holly in the Third Circuit, where the trial court was overwhelmingly concerned with the condition of subject properties, which were boarded-up houses with absentee landlords, relentless crime and overcrowding, and used these facts to drive its analysis. But the Third Circuit found that such reasoning distorts the focus and analysis of disparate impact under the FHA. In contrast to Mount Holly, where the properties were effectively uninhabitable, Evergreen Terrace is currently home to hundreds of African-American families and has been for the last 20-plus years. And, in fact, the contracts in place anticipate that it will be home for the next 20 years. No one's argued that Evergreen Terrace is uninhabitable. The crux of Joliet's case involves allegations of blight. However, the evidence of blight, as I submitted, is at best stale and based upon conditions prior to the $5 million in HUD-financed improvements, which were completed in 2011, the so-called REACT scores, and select incidents of crime. A closer examination of that evidence reveals that, you know, major deductions from the July REACT scores were ‑‑ well, perhaps I'll defer on further detail on that since I see my time is up until everybody. Mm-hmm. Thank you, Mr. Teslav. Very well. Ms. Jones. Good morning, Your Honors. May it please the Court, I'm appearing on behalf of the plaintiff, Apolli, here in the city of Joliet. The appellants, who I'd like to refer to collectively as New West, have raised several arguments. And I'd like to start with what is not really at appeal here. First of all, this was an eminent domain case, and contrary to what my opponents said, there was clear evidence of blight presented both at the time the condemnation decision was made in 2005 and continuing through the date of the trial, which is what the trial court ruled would be relevant. This evidence included substantial evidence involving a failure of two separate REACT inspections, and the New West's own expert testified that essentially the standards in the HUD REACT inspections and blight standards were largely similar. But it also included substantial evidence of continuing issues of mold on the property, infestations of rats and cockroaches on the property, severe crime, issues with the security on the property, etc. And this is all set forth in the court's findings, so I don't quite understand how it's being asserted that the trial court didn't consider these issues. And significantly, another thing that was rejected by the trial court, and it's not really on appeal here, is that the decision to take the property by the city of Joliet was pretextual. And in particular, the idea that this was motivated by intentional discrimination has been rejected. So all that really remains is this argument that even if not intentional, that the decision to take the property would have a disparate impact on some groups,  And the evidence there, again, is completely lacking. And I think it's significant that if... I must say I'm a little worried that we're going to end up retrying this case in the FHA action as a result of the lack of a jury trial in the condemnation action. Did anybody suggest to Judge Norgal that he impanel an advisory jury? No, Your Honor. And in fact, the fact that the Fair Housing Act... That's the normal solution to this kind of problem. And it's right there in Rule of Civil Procedure 39C1. I find it very puzzling to have this complex fight over jury trial and potentially over preclusion, and nobody asked for an advisory jury. Well, Your Honor, Joliet's position at the time was that it should simply be tried as a condemnation action and the Fair Housing Act claims reserved. But New West at that point in time strongly opposed that solution. And in fact, if you look at the procedural history of this case, the Fair Housing Act claims were added to the defenses in the eminent domain case only after New West Supremacy Clause arguments were rejected by this court. And at that point in time, in 2009... None of this has anything to do with the Rule 39 issue. There's obviously no right to a jury trial in a condemnation case. Yes, Your Honor. That depends on state law. There's no right even in a condemnation action under federal law. But the advisory jury used in either condemnation or federal tort claims act cases is a solution to the problem of preclusion, inadvertent preclusion by the sequencing of the actions. That's the thing that's puzzling me, that nobody suggested it. And certainly Judge Norgel didn't mention the possibility on his own. It was not something that anyone in the case raised or considered, I agree, Your Honor. And I think under the Parkland-Hosiery case, there's really not an issue with respect to jury preclusion because as this court has held, the argument is in the Fair Housing Act case and the argument becomes, are these preclusive findings or are they not? And I think under Parkland-Hosiery they are, but at any rate, that is an issue in the separate case. Now I want to ask you about the HUD settlement because the judge said that the settlement was substantially the same as Joliet's plan all along. Where in the record can I find what Joliet's plan was before the HUD settlement? Yes, Your Honor. If you look at some of the findings that the court made with respect to Joliet's plan, the particular part the judge is talking about is the fact that Joliet always intended to keep a certain portion of the subsidized units on the property because it was Joliet's intent to create a mixed income neighborhood. And so if you look at the appendix at page 48 and 54, and also Joliet's proposed findings 268 through 271 and 274, all of which the court adopted, so those are also part of the record. Those are also part of the findings that the court made. Those all set forth Joliet's plans from 2002 onward that always intended a certain portion of the subsidized units to be kept. Another significant element and really the other issue that the settlement agreement is cited for is the fact that HUD was going to issue vouchers. But it is entirely speculative whether those vouchers would be used in this neighborhood, right? Or even in Joliet itself? They could be used anywhere? They could be used anywhere, Your Honor. But first of all, as to whether or not the HUD would issue them, there was never any question as to that. Really the settlement agreement is cumulative as to that because HUD had confirmed to Joliet from 2005 onward, and Charles Williams testified at trial, as did Theodore Toon, that, yes, if the property had any subsidized units reduced, vouchers would be issued to support that. Right, but we can't know with any certainty whether the vouchers would be used in Joliet. So this condemnation does have a discriminatory impact because 90% of Edgewood is African-American occupants. Well, Your Honor, let me respond to that. And the question is whether the non-pretextual blight justification is satisfactory to overcome the showing of discriminatory impact. Well, what the Court found was that there is no adverse effect at all from the taking because any subsidized units would be replaced by other subsidized units, the vouchers. Actually, no, a voucher isn't a unit. Oh, I'm sorry. Any subsidized housing would be replaced by other subsidies, other subsidized housing. Other forms of subsidy. So the argument becomes— Which may or may not be built or used in Joliet. Correct, Your Honor. So then the argument becomes, is there any evidence that these vouchers are not usable or will be used in other locations in a way that would actually be considered a segregative effect? But the problem is you're looking at the entire Chicago metropolitan area. So if you had a tenant, and most of the tenants work in Joliet, and this plan forces them to move to Waukegan, that housing is not really available to them realistically. And that's why it's important that there's no evidence in the record whatsoever that these vouchers wouldn't be used in Joliet if the tenants wanted to use them in Joliet. And that's on the assumption that landlords would accept the vouchers in Joliet, right? That is, Your Honor. And there was not evidence that there was a whole slew of landlords that were willing to accept these vouchers, right? There is evidence of that because there's evidence— And how significant is that number as it relates to those that would be displaced? The number of units that would potentially be replaced is 241. The evidence that we have is what has happened with vouchers in Joliet to date. And the evidence is that of the 1,000 to 1,100 vouchers that are currently issued by the city, by the housing authority for the city of Joliet, which actually covers all of Will County, is that there's an extremely high utilization rate. The utilization rate is people who are issued the vouchers, are they able to use them? And the evidence is that it's in the high 90s. So that's one bit of information. Is that the right way of looking at this, though? What's the available housing stock in which to use the vouchers, which are replacing the demolished units? Again, if you look at the record of what actually happens with vouchers currently issued by the city of Joliet, and, again, it covers all of Will County, but they are essentially all used within Joliet or Will County. Right, but is the remaining housing stock capable of absorbing all of the displaced residents? Who will use the vouchers mostly, right? If you look at the court's finding, based on the census evidence that was presented, the district court found that it was. That there is enough vacant housing stock or available housing stock to use the vouchers? Based on the census records, there are more than enough vacancies in the city of Joliet, even not including Will County, to cover them. Within the rental that's covered by the voucher? In fact, that's an important point, because the rental is based on the Chicago-Naperville-Joliet metro area as a whole, and the evidence is that housing costs in Joliet are substantially lower on average, which is one reason why if you look at what happens with vouchers, there's a larger number of people who port in to the city of Joliet than port out, which means that they have vouchers that are issued by the city of Chicago, or by the city of Milwaukee, or anywhere, and they choose to move in to Joliet and use the voucher there. And there's more people coming in than coming out, which completely contradicts the idea that New West has made that there is a shortage of housing available in the city of Joliet. I would also point out that the burden was on New West to show that these vouchers would not be usable, because otherwise this is very much like the inclusive communities case, which says that it's really a matter of priorities for the metropolitan agency, or in that case it was a housing agency, but here it would be the city. But the city, when dealing with problems such as segregation and blighted housing and all of that, should have a substantial ability to decide the proper policy to deal with it. And I think the inclusive communities case shows that the Supreme Court was concerned that the use of statistics in these Fair Housing Act cases is being used to try to substitute somebody else's priority for a genuine, fair decision by a city that I'd like to handle it one way versus another. Right, and that goes to the question about the blight issue and whether it's sufficient to overcome whatever disparate impact this condemnation would have on the African-American population of Joliet. And that evidence seems to me is very strong, or at least the district court thought it was very strong, and persisted even after a bunch of public money was spent to renovate this complex. Yes, Your Honor, and I'd also like to point out that as far as there being a disparate impact, again, the subsidies, one subsidy replaced another, so there's no adverse effect in that way. Right, Joliet's going to a different model of supplying low-income housing. That's what's going on here. Right, very similar to what the city of Chicago did. And the other issue is whether there would be a segregative effect, and this case is really nothing like the situations presented in cases like Huntington Branch or Mount Holly or the Arlington Heights II case, because unlike the cities there, in those cases the various zoning laws or failure to approve a public housing project essentially removed a large portion of the African-American community or maintained a basically all-white community. Joliet is an extremely diverse community. It's only 53 percent non-Hispanic white in the city as a whole, and in the particular area that Evergreen Terrace is located, the Joliet Township, which is kind of the older part of Joliet because Joliet did a lot of expansion to the West, the statistics there are 45 percent non-Hispanic white, 35 percent Hispanic, and about 25 percent African-American. I realize that doesn't add up perfectly. So we're talking about a very diverse area, and in that area if the 241 people who received vouchers, if some of them elected freely that maybe they didn't want to stay where they were but wanted to move to either other parts of Will County or to Chicago or to Tampa, Florida, or wherever they might choose to move out of their own freedom, that would actually have no meaningful effect on the demographics of Joliet at all. In fact, the expert for New West said that his assumption was that people would use the vouchers in the same pattern as people who currently receive vouchers, and when you ran those statistics, the actual demographics didn't change one iota. So the idea that this is going to have a segregative effect of the sort that has been considered cognizable under the Fair Housing Act is simply not the case at all. Well, in light of the rental amounts in those statistics you cited, wasn't the property more valuable because it was a Section 8 property with guaranteed rents from the federal government at perhaps a higher rate than the market would have been? Well, Your Honor, the concern about that and why the judge properly held that the value of the HAP contract should not be considered is because when Joliet is condemning the property, Joliet is condemning just the property and not the HAP contract. And if the added value that New West's expert maintained was added by the existence of the HAP contract was included, that would essentially mean that in taking property in eminent domain, they not only had to pay for the property, but also for an additional contract between New West and HUD that wasn't even the lease on the property but was a separate contract. And that is not the case under Illinois law. In fact, under the Chicago land clearance versus Darrow case, the Illinois Supreme Court looked at a situation where the party had argued that the value of a hotel on property should have been considered and said that it should not have been admissible. So that's one reason why the court was correct. Another reason is because it's simply not, as the court said, it's speculative what the value of this HAP contract adds, and that's consistent with the testimony in the eminent domain trial because contrary to the idea that these HAP rents were supposed to give above-market profits to the owner, it was testified by HUD and by the owners that the only reason for above-market rents was to pay for above-market expenses, and therefore there really should have been no meaningful effect. And added to that the idea that they should have considered the value of other subsidized properties, again, you have to look at the details with respect to how these HAP contracts were set, what the rents were, what other benefits the owner was getting. This is essentially not what's looked at in an eminent domain case where you look at what a willing purchaser would pay a willing buyer, but it's a situation where you're looking at what additional value the purchaser is getting also from a third party not involved in the transaction, and that's why it would be speculative and simply contrary to the law to consider that.  We would rely on the arguments in the briefs. Thank you, Ms. Jones. Anything further, Mr. Teslaff? Just briefly, Your Honor. The district court did recognize that the expert testimony pointed to a shortage of tenant-based and voucher-based housing. The waiting list for Section 8 vouchers in Will County, which is Joliet's home, is currently closed, contains thousands of families, with thousands more precluded from even applying to the waiting list. Significantly, almost 90% of those on the waiting list are African American. There's simply no evidence that sufficient housing exists in Joliet to accommodate the displaced residents of Evergreen Terrace that will jump now this waiting list and receive vouchers. The mere promise doesn't assure the voucher can be used. A closer examination of the evidence of blight shows that, with respect to the REACT scores for Evergreen Terrace, what produced a failing score were things such as broken glass on the ground, a damaged retaining wall, a knockout missing from an electrical panel in a boiler room, recent crime cited to in the district court's opinion. Shots were fired from a BB gun into the guard building in 2010. A tenant was caught breaking into another unit with a screwdriver and a drill, January 2011. A guest of a resident was stabbed in the parking lot, November 2011, and a person standing outside the gates of the property opened fire into the parking lot in April of 2012. These were all addressed promptly. Yes, they're unfortunate. Do they constitute blight? I respectfully submit they don't. Well, even if we agree with you, there is a disparate impact. Inclusive Communities said that a valid public purpose is a defense to a disparate impact claim. And didn't the district court find Joliet had a valid public purpose? And the proposed alternative you've provided doesn't allow for the extension of the public park, right? Not at this time, no. No, it suggests that, well, that any public park consideration should be taken into consideration in connection with the maintenance of public housing, which is badly needed in Joliet. You know, finally, not only did the court emphasize blight, but it disregarded or excluded almost all the evidence of Joliet's discriminatory intent. It excluded and ignored the down zoning from the period of the 1990s on, even though the court recognized and admitted evidence about the condition of the property at that time. And the significance of that, ignoring the downsizing? Throughout this period of time, Your Honor, Joliet took steps to get rid of subsidized public housing in Joliet. And the impact of that was on African Americans. And that evidence, why exclude it? It's a bench trial. Why not at least admit it and consider it? But it was simply excluded. It makes no sense. It didn't have to be dealt with for that reason. But when you look at the— Thank you, Mr. Tetzler. You're very welcome. The case will be taken under advisement.